Good morning. David Brody from the County of San Diego for the appellant. County of San Diego, and I would like to reserve three minutes for rebuttal. All right. Watch your clock. I will. When children are removed from their parents' care due to suspected abuse or neglect and they're placed in protective custody, the parents and children's rights to be together during that time are diminished. The parents don't have a right to be together with the child at everything that happens during protective custody, and they don't have the right to be with the child when they're having a routine medical exam, when that exam is for the purposes of protecting that child's health and the health of the other children in that protective custody environment. That's the context that this case is in. The children in this case had routine medical exams, and they were not the sexual abuse exams that were dealt with in the Wallace v. Spencer and the Green v. Camretta cases. Those cases dealt with an investigation of sexual abuse where the purpose of those exams was to find out whether those children had suffered sexual abuse or not. Wasn't these examinations at Polinsky, weren't they at least in part investigatory? Well, the doctor did say that one of the things that she does is she looks for signs of abuse or neglect, but that's not the purpose of the exam. You can have dual purposes, right? Sure. And so part of the purpose could be general health and safety, and part of the purpose could be investigatory, right? Yes, but I think that's talking about what the exam actually was. So during that exam, the doctor, and it's Nancy Graff, the pediatrician here, she is looking for signs of abuse or neglect, but the purpose is to protect the child's health. These exams were primarily for that purpose, as well as to make sure that there were no communicable diseases brought into the regular, the rest of the children who were there. Just sort of as background, weren't there three decisions in San Diego that stated that the county processes for conducting medical examinations at Polinsky violated the 14th Amendment while this case was pending or even before it was filed? No, there was only one case, and that was the Parks v. County of San Diego. That had been decided when this incident happened. This was in 2010. Parks was back in 2004. Okay, but since then, I understand Polinsky's changed its procedures and its consent form. Yes. So I guess the background question I have is why are you still litigating this case when you've already changed your procedures to conform with what the courts have held in other cases? Well, we did change the procedures. That was after the Swartwood case in 2014. Right. Swartwood. Swartwood, okay. Yes. Got it, mistyped here as Smartwood. Oh, yes. Swartwood. It happens a lot. I know. That case came out in 2014, and the county did decide to change the way the exams were done after that case. But we're litigating this case because we don't believe that the parents have a constitutional right to be present at that exam, and we had numerous reasons why we felt like the government had a compelling interest to do the exams as they were being done at that time. The exams in this case, as I said, happened in 2010, and the county had compelling interest to provide for these children's health because the county had a duty to provide adequate medical care for these children who were in the county's custody. And the county needed to have these exams as quickly as possible after the children came in to Polinsky, and that was for the health of that child as well as the health of the other children who were there. The two cases that I referenced, the Wallace case and the Green case, the exams in those cases were fundamentally different than the health exams that we're talking about at Polinsky. So as I understand, there's two layers of examination. One, there's sort of the first general exam. The nursing assessment? Right. Yes. And that's for the general health, contagious diseases. That's primarily for anything obvious and critical, needing right now, and they check for lice. That's one of the main things that they check for. The doctor checks for additional communicable diseases such as chicken pox and TB. That's the second exam. Right. So that's the doctor's exam is where they check for things like chicken pox and tuberculosis. But these exams were not those sexual abuse exams that were dealt with in the other cases. Those cases were the exams were focused on trying to determine whether abuse had occurred or not, and the focus of those exams was on the genitals. They're trying to decide are these girls, have these girls been sexually abused, and obviously the entire exam is focused on that. We have a naked girl lying on an examination table with her feet up in stirrups and the scope and magnifying glass and photographs being taken of her genitals. Of course, this court in Wallace and Green found that those exams are potentially traumatic, and the courts in those cases cited evidence studies showing that those types of exams could be traumatic. That is not the case in this situation. It is a completely different context in protective custody. The exams are completely different. There's 22 points on these exams, and they're a basic health care exam that a child would have in a private pediatrician's office. There is no focus on the genitals as there is in those sexual abuse exams, and there's no evidence that these type of exams that were done at Polinsky are potentially traumatic to the children. If there are no other questions, I'll reserve the rest of my time for rebuttal. All right. Thank you. Good morning, Your Honors. Donnie Cox for the plaintiff, and Cross Appellants, may it please the Court. I'm almost at a loss for words when counsel describes these examinations as examinations that are not potentially traumatic to a child. As described by Dr. Graf very vividly in her deposition in this case, and by the way, Dr. Nancy Graf was the director of Polinsky Children's Center. Dr. Graf testified that she has the children, the girls, drop into a frog-like position so that she can spread the labia of the little girls to examine the hymen, physically spread the labia, and she's looking for concentric indications in the hymen. That is a sexual abuse examination, regardless of what they call it. But they admitted in deposition that it was at least in part for investigatory purposes.  And I'll get to that in a second, because I think you're right. I mean, their position is that these are not just forensic exams, but they're also health exams for the children. But in addition to the genitalia exams, they're drawing blood on these children. They're doing PPD exams looking for, basically it's a tuberculosis exam. They're doing drug screens, regardless of the allegations. There were no allegations. In this particular case, the district court found that the removal and detention of these children was unconstitutional, because the warrant that was used, the warrant application, contained material omissions, and but for those omissions, no magistrate would have agreed to have these children removed. So there are two really important positions or two important concepts that are at play here. The first is that any physical examination of a child, any physical examination, period, and all the cases cited by both parties indicate this, implicate the Fourth Amendment. They are considered searches, regardless. That's number one. And number two, every case that's cited says that parents have a fundamental constitutional right to make important medical decisions for their children. That is, you know, that is a precept that goes back to 1979. People have a right to be present when their children are having medical exams done, and they have a right to make a decision about whether those exams take place. Let me clarify your position. It's that there's no objection to the sort of routine general health assessment, the initial screening that was done, right? You're not asking us to go that far. It's that the nature of this was, in part, investigatory, and that triggers the Fourteenth Amendment concerns. Did I get your position correct? That is our position here, Your Honor. We have not challenged the nursing assessment in this case. By the way, the nursing assessment is taking the temperature of the children, checking the children for measles and mumps, not the doctor's exam the next day. They're making sure that the children don't have lice. They're making sure that all of that's the case before they're placed into the general population. The kids are then, after the nursing assessment, when the kids first get there, they're then placed into the general population, and then it's up to 24 hours later before this intrusive and invasive examination is done by the doctors. Now, again, in this particular case, the parents, well, first of all, they got a warrant to remove the children, a defective warrant. But at that point, they could have asked the court to do an examination of the children. They didn't. The next day, the parents were actually in court while this examination was taking place, and it wasn't until after the court hearing that the parents were asked to sign these consent forms, which really are not consent forms. They do not tell the parents that they're going to do a physical examination of their children. The consent form simply says that the children need treatment, that they can treat their children while they're in the custody of the county. And there's a little box to check that says, if you would prefer that your children be treated by your physician, by their physician, please mark this box, which they did. Never do they mark this box. If the court will take a look at Nancy Graf's deposition, and it starts at ER 130 through, actually, I'm sorry, 106 through 134, yes, 134, I believe. You'll see at least a half dozen instances where Dr. Graf says that she is doing an investigatory medical examination. But that's why it is so important that the defendants read Wallace and they read Green very narrowly. Both Wallace and Green say that parents have a right to make important medical decisions for their children. And it's not just a forensic exam. There's no question that this is a forensic exam, at least in part. But parents have a right to make decisions for their children. And this case is the poster child for the need for judicial oversight of those kinds of examinations. These kids should have never been removed in the first place. And the fact that they were on a faulty warrant just emphasizes the fact that the courts need to step in and determine whether or not these kinds of intrusive exams are done. So is it your position that they need parental consent whether or not the exam is investigatory? It would be our position that any time there's a medical, intrusive medical examination, yes, they should have either parental consent, court order. And there's another important time when they can do these exams. If there's exigency, if the child complains. Special needs exception. Well, not special needs exception, Your Honor. That's a different concept. Exigency deals with the fact that the child needs immediate medical attention or complaining of some sort of problem. For instance, they come across measles. If a child comes in and complains that their back hurts or other parts of their body hurt, of course they can examine those children and render treatment. But this is not what happened here. They're on a fishing expedition. One of the other things that happened during the course of this litigation, the court mentioned the litigation that we've talked about here over the course of the last 15 years in this case. We have finally got a copy of the contract after the discovery and this case had closed that indicates that the county is required or requires these doctors to do these kinds of examinations. And they call them evidentiary examinations. Interestingly, the court referenced the Swartwood case. After Swartwood, the county changed its examination rooms. And if the court will take a look at SER 26, it's the rendering for the new examination room, which was referred to as the evidentiary exam room. Some of their documents. These are evidentiary exams. They know that they are. I think Your Honor asked a good question when you said, why are we here? The county claims that it has changed its policies and practices. It either gets a court order or consent and allows parents to be present for these exams. Well, I think that it's really important that the court render a decision telling the county that these examinations are unconstitutional so they don't go back to doing it the way they were. Four different jurors looked at this, at these examinations, and determined that they were unconstitutional. They are. We ask this Court to find that way and render a decision in favor of the plaintiffs. By the way, we're asking the Court to affirm the district court's decision that parents have a right to be present and reverse the district court's decision that no judicial authorization is required. Thank you. All right. Thank you very much, counsel. One of the missing elements here is the proof that this type of exam shocks the rights of the plaintiffs. That's what's required for a Fourteenth Amendment violation, that these exams, which were primarily for medical needs of the children, somehow shocked the conscience because the county was deliberately indifferent to any clearly established rights. There was not at the time, and there is not now, any clearly established right for parents to be present at these types of examinations. The examinations in Wallace and Green were described by this Court in Mueller v. Auker as solely for investigatory purposes. They're trying to determine whether abuse or neglect happened or whether sexual abuse happened. That is not the case in these exams. As we talked about, the doctor did say that she does look for signs of abuse or neglect, but the purpose is for the health of the child. That is not the case in Wallace. They testified to a dual purpose. Exactly. A dual purpose of looking for signs of abuse or neglect, but for the purpose of protecting the child's health. It's not like in Wallace and Green where that purpose was as part of an investigatory criminal investigation of whether the parents were guilty of sexual child abuse or not. What difference does it make if you have an examination that's solely for investigative purposes versus an investigatory examination that's piggybacked onto a health and welfare check? Why should there be a distinction between those two scenarios? One of the issues is the governmental interests involved. Here where there's the health interest involved, that's a compelling interest by the county because we want to make sure that these children are healthy when they're going into the rest of the population. The testimony was that these children often have not been provided much health care throughout their lives, and the doctors at Polinsky have discovered many serious health conditions. So there's a very compelling governmental interest in this case to protect the health of the children, and that's part of that component that is not present in those exams that are solely for investigative purposes. Those types of exams in the Wallace and Green cases are focused on criminal investigations, and the government does not have the interest in protecting the health of the children that they do as they do in the Polinsky cases. This court in Wallace said that those exams, the parents have a right to be present at those exams because they're potentially traumatic, and they cited evidence that they are traumatic for young girls, and because the parents may have a need to make medical decisions. That's not the case in the Polinsky exams. The Polinsky exams, the doctors at Polinsky are not providing treatment at that time. If there's any condition that is discovered, the parents are contacted and they are part of that decision-making process, and that's pursuant to state law. It's only if the parents refuse to provide treatment that the county could get a court order to provide the treatment, and obviously that's not in this case. The county does have important interests and did at the time of these exams in the efficiency of exams. We're talking about Polinsky where thousands of children have come in throughout the years, and every day there's more children coming there. We need to, as quickly as we can, determine that that child does not have anything like chicken pox or tuberculosis that could be spread throughout the rest of the children, and it is important to have those exams quickly as soon as the doctor arrives there rather than trying to contact the parents and see when they're available and all of those things that can delay the exams, and  this case noted that as a concern as well. And the exams were held in a confidential area of Polinsky where parents were not allowed to be there because other children at the facility were there, and there was no provision at the time for those exams to be held anywhere else. I just want to make sure I understand. We're talking about the second exam, correct? Yes, the doctor's exam. Now, for the doctor's exam, they inspect the genital area, the rectal area of these children? Externally, yes. Now, normally, I mean, I have two kids and we take them in for basic checkups. I mean, I can't say it's never happened, but that's not the usual checkup for little kids. So in terms of a welfare check, is that typically what they would do to make sure they don't have lice or tuberculosis? Well, no. That's part. The first exam by the nurses is for the lice. The second one by the doctors is tuberculosis, but also it is a full-body check from head to toe, and that's as advised by the American Academy of Pediatrics. But for investigatory purposes or to make sure that? No, not at all. The AAP says for an exam, a medical health exam for a child entering foster care, they should have a full-body exam including all clothing taken off and a check of the genital and rectum area. So that is part of a typical exam that the AAP recommends for children entering foster care. I think they also say when appropriate and as part of the care plan of the Child Welfare Agency, birth parents should be encouraged to be present at health care visits and to participate in health care decisions. Yes, and that is that issue that the Wallace Court talked about where if Polinsky exams do not involve the need to make health care decisions, because if the doctors do notice anything, they are contacting the parents and they're involved in that. Based on my experience, I think Judge Owens is correct in that it's not the sort of physical exam that is given to young children. It usually starts when they're a little bit older as a regular course. I do know that the doctors have testified that it is a brief exam of head to toe, that they need to make sure when a child comes in there. That's what Nancy Graff testified to. That's not what she testified to. Well, I think she said the entire exam lasts about 10 to 15 minutes. And the form that we have, which is part of the evidence, shows the 22 points of the exam. The genitals is one of those 22 points. And we do have a case in this case that one of the children at least did not have that part of the exam at all because she was too squirmy, and another child only had part of that. The kids were like four and six? I think three and six, yes. Three and six at the time of this. Yes. And there is also testimony that the children would, throughout their time at Polinsky, have other things where they were unclothed, such as bathing or changing their diapers, things like that. So when we're talking about would these be traumatic to children. I don't think either Wallace or Green made a distinction between invasive or non-invasive or traumatic or mundane. I think that's just a misreading of those cases. Well, Wallace did say that it's because those exams are potentially traumatic. And Green also said that is one of the reasons that it's compelling for those parents to be there. It basically just set out a fundamental right of parents to consent to and be present at treatment of their kids. Fundamental right. Yes. And I think what we're saying is that the parents' rights are diminished somewhat when they're taken into protective custody, and the parents don't have a right to be there for everything that happens. And why did the county ask for consent in the first place? Why did we ask for consent? That's what the consent form was. Yes. Well, the county wanted to do everything right. And the county said, look, we want consent from the parents. We want a court order. We want authority to do these tests, to do these exams. And the court order said the exams should be done in compliance with the recommendation. So the county was not on its own just doing these exams. The county had that court order that said you may do these exams, and they did and tried to get consent from the parents. That's also for the medical care. The consent form says if our child needs medical care, we would like to have either a private physician or somebody else provide that care. And the parents in this case did list their private physician so that if there was anything found in these tests that needed treatment, they would contact the private physician and the parents to provide that care. All right. Thank you very much, counsel. Thank you. Are there any further questions? No. Okay. Mann v. County of San Diego.
judges: Wardlaw, Nguyen, Owens